269 N.E.2d 888 (1971)
Lee EADS, Sheriff of Marion County, et al., Defendants-Appellants,
v.
J & J SALES CORPORATION, an Indiana Corporation, Plaintiff-Appellee.
No. 1069A184.
Appellate Court of Indiana, Division No. 1.
May 27, 1971.
Theodore L. Sendak, Atty. Gen., William F. Thompson, Asst. Atty. Gen., Mark Peden, *889 Deputy Atty. Gen., Indianapolis, for defendants-appellants.
Arthur J. Sullivan, David F. McNamar, Steers, Klee, Jay & Sullivan, Indianapolis, for plaintiff-appellee.
SULLIVAN, Presiding Justice.
In this class action a permanent injunction preventing various law enforcement agencies from seizing appellee's pinball machines, among others, as gambling devices is challenged on appeal as being contrary to the anti-gambling statute of Indiana.
The plaintiff-appellee's complaint stated that the plaintiff was engaged in the business of leasing amusement-type pinball machines; that it derived $15-30 a week from the operation of each machine; that the lessees of the machines received 50% of the weekly receipts of the machines (or approximately $15-30); that the plaintiff's machines were not equipped with any special equipment commonly associated with professional gambling devices; that the plaintiff had leased approximately 350 amusement machines in Indiana, which when new had an average cost of $650 each; and that the threatened confiscation by the defendants had caused return of several machines from lessees thus causing interference with a valuable property right of the plaintiff. The trial court granted the plaintiff a permanent injunction against interference with the machines in question by defendants. The defendants filed a motion for new trial. In that motion the defendants alleged that certain findings of fact were erroneous; that there was an insufficiency of evidence to support the trial court's findings and that the decision of the trial court was contrary to law. The crucial finding of fact here attacked by appellants is as follows:
"9. That the counter or indicator which is located on the upright portion of the machine and which is visible to the player serves no purpose other than a visible counter and merely informs the player as to the number of free plays won or prepaid games or both."
Appeal is here taken from the overruling of the Motion for New Trial. The appellants have grouped the three errors specified into a single argument: That the pinball machines distributed by the plaintiff-appellee are gambling devices within the letter and spirit of the 1955 Hasbrook Anti-Gambling Act as found in Ind. Ann. Stat. § 10-2330(4), (Burns' 1970 Supp.), being I.C. 1971, XX-XX-X-X:
"(4) `Gambling device' means any mechanism by the operation of which a right to money, credits, deposits or other things of value may be created, in return for a consideration, as the result of the operation of an element of chance; any mechanism which, when operated for a consideration does not return the same value or thing of value for the same consideration upon each operation thereof; any mechanism, furniture, fixture, construction or installation designed primarily for use in connection with professional gambling; and any subassembly or essential part designed or intended for use in connection with any such device, mechanism, furniture, fixture, construction or installation: Provided, That in the application of this definition an immediate and unrecorded right to replay mechanically conferred on players of pinball machines and similar amusement devices shall be presumed to be without value." (emphasis added)
It is the position of appellants that the visible numbers appearing in a small square on the scoreboard of plaintiff's machines, which refer to free replays and credits due the players, constitute a record by which payoffs can be computed and that said machines are therefore unlawful. In this assertion of illegality they rely upon a statement by the Indiana Supreme Court in Peachey et al. v. Boswell, Mayor et al. (1960), 240 Ind. 604, 167 N.E.2d 48, *890 concerning the intent of the legislature in passing the statute in question:
"The clear intent of the Legislature was to prohibit the use and `maintaining' of pinball machines which are equipped with recording devices that may be used to compute `payoffs.'" 240 Ind. 604, 614, 167 N.E.2d 48, 53. (emphasis supplied)
The impetus to attempt seizure by appellants was, however, provided by a 1968 Opinion of the Attorney General of Indiana:
"It is my opinion that a visible meter which automatically records the number of free replays, whether mechanically or electronically conferred, causes a machine to be a `gambling device.' Such a machine is a `gambling device' regardless of the existence or nonexistence of an internal meter which further records the cancelled free replays." 1968 O.A.G. 213 at 215-216.
Appellants thus contend that the free game indicator common to amusement machines is a recording device which can be used to compute a payoff from the lessee to the player, in that it accurately records rights to free replays for which value may be given. Contrariwise, the appellee contends that the visible indicator is one which merely discloses the condition of play at a given moment and is not a device which makes record of a right of free replay.
In giving proper weight to the argument of the appellants and to provide clarity to the meaning of certain essential terms, it is necessary to review the background of the 1955 Hasbrook Anti-Gambling Act. It is also necessary to consider the official comments of the Commission which drafted the prototype from which the Indiana anti-gambling act was drawn.
The first section of the Hasbrook Act proclaimed the public policy to be the protection of the public from the evils of organized and professional gambling as follows:
"It is hereby declared to be the policy of the general assembly, recognizing the close relationship between professional gambling and other organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such activities when conducted for the profit of any person; to safeguard the public against the evils induced by common gamblers and common gambling houses; and at the same time to preserve the freedom of the press and to avoid restricting participation by individuals in sports and social pastimes which are not for profit, do not affect the public, and do not breach the peace. All the provisions of this act shall be liberally construed to achieve these ends, and administered and enforced with a view to carrying out the above declaration of policy."
In the Model Anti-Gambling Act drafted by a special committee of the 1952 National Conference of Commissioners on Uniform State Laws, this intent was evidenced in the prefatory note to the model Act:
"The instant draft is designed to strike at the professional [gambler] with every enforcement device which has proved effective in the experience of all the 48 states * * *"
Handbook of the National Conference of Commissioners on Uniform State Laws (1952), p. 210.
Appellants' argument and the nature of the machines here considered must therefore be viewed not in the abstract, but rather in the light of the legislatively declared purpose to prevent the encouragement and spread of professional gambling. According to the appellants' interpretation of the Peachey case, supra, the test of legality is the use to which the metering *891 device may be put rather than strict adherence to a test "based upon an abstract dictionary definition [of record]."
However, several lethal aneurisms appear in this argument. The first is the difference between an indication and a record. According to Webster's Third New International Dictionary (1961) the verb "record" means:
"b(1) to make an objective lasting indication of in some mechanical or automatic way: register permanently by mechanical means" (emphasis added)
The verb "indicate" by contrast means:
"* * * to point out or point to or toward with more or less exactness;
a(1): to show the probable presence or existence or nature or course of: give fair evidence of."
The noun "indication" further aids in the delineation of meanings:
"3. the degree indicated in a specific instance or at a specific time on a graduated physical instrument (as a thermometer): READING" (emphasis added)
It should be obvious that a device which "indicates" is one which reports on the condition, course, or nature of an event or process at a given point in time. In contrast is a device which "records" or makes a record of an event or process in the form of an "objective lasting indication" or a "permanent registration." It is the permanence of the indication which distinguishes the two terms.
This basic distinction in terms as applied to pinball machines was made clear to the trial court by Mr. Rufus King, draftsman of the Model Anti-Gambling Act adopted nearly verbatim by the Indiana Legislature, as an expert witness for the plaintiff-appellee. In response to the question, "Mr. King, what would you consider to be a recording device?", he stated:
"* * * [A recording device] * * * [is] any device built into one of these machines which makes a record of free games removed or redeemed, a record which endures beyond the course of the play. (emphasis supplied) The device on the backboard which indicates to the player in the course of the play his playing position * * * the accumulated credits on the bingo machine, [or] the accumulated free games which must be played off on the amusement machine. That [backboard indicator] makes no record because [with both bingo and amusement machines] when the play of that player, the engagement of that player with the machine, is concluded, * * * [the indicated numbers] are reduced to zero (0). This is sort of like a barometer which indicates currently the barometric pressure. A barograph makes a record * * *. [The presence of a] device in this kind of machine which makes a record of * * * free games that were redeemed or knocked off * * * [is] the sine qua non of a gambling operation. Otherwise if you don't have some kind of record, * * * the games can't serve as a payoff tally. The bartender can still pay-off, but he is betting with the player of the machine, the machine is not controlling payoffs * * * But [the term] unrecorded [in the Model Act] was aimed at * * * [the recorder's function as to payoffs] without which you can't operate one of these machines as a gambling device." (Tr. pp. 224-225.)
No matter how the appellants view it and attempt to diminish its quality of permanence, the term "record" is not synonymous with "indication." A word cannot be made to mean what we choose it to mean *892 to accommodate a particular interpretation of the statute.[1]
A record must be permanent in nature, although it may be used only temporarily and then discarded. This is the underlying inference of State v. Mazzarella (1967), 103 R.I. 253, 236 A.2d 446, a case in which the appellants surprisingly seek refuge. In that case a patron of a "bookie joint" wrote a bet upon a matchbox cover. When police unexpectedly raided the establishment, he tore the matchbox cover into two pieces, and discarded them, hoping to destroy the evidence. The two halves were found and the writing, in the form of a memorandum, was held to be a "recording" under Rhode Island law. Appellants' suggestion that the free game indicator is in the same sense a "memorandum" or informal record again disregards the basic distinction between the terms "record" and "indicator."
Again, referring to the comments of the Commission which drafted the Model Anti-Gambling Act, the "record" meant to be the test of illegality of pinball machines is stated as follows:
"The test imposed is the presence or absence of the so-called knock-off button or replay meter, which makes it possible for the machine to be used as a gambling device by means of a mechanically recorded payoff made to winners by each location owner. This test has been noted with approval by several courts."
Handbook of the National Conference of Commissioners on Uniform State Laws (1952), pp. 217 and 218.
Thus, the replay meter which makes record of free games eliminated from the machine by means of a knock-off button[2] was felt by the commission to be the device by which law enforcement agents could determine the legal status of a pinball machine.
From the language of the definition section of the statute itself, it appears that the mere awarding of free replay is not the transgression, for immediate unrecorded free replays are specifically permitted. In actuality, however, even the machine which gives an immediate unrecorded right of replay could be used to compute payoffs. But use of the indicating meter on the face of the machine to compute payoffs would at best be only a rough approximation of free games won as both free replays and prepaid games[3] are included in the numerical indication. As it would become difficult to readily distinguish between what a player has won and what he has already paid for, a finding that such a machine should be considered a gambling device under our statute becomes even more tenuous. Not only are payoffs improbable on the amusement machine since they would be speculative at best, but the inconvenience and difficulty of removing free games without aid of a knock-off button also militates against these machines being considered gambling devices within the meaning of the statute. To accomplish *893 the latter task, the lessee-proprietor would be required to manually activate the coin lever or play initiating button and then to "knock off" the free replays by tilting the machine or expending the total number of balls allotted for that game. As the number of awarded and prepaid games increases, the task becomes both tedious and counter-productive as that time must be spent away from the proprietor's other duties. Such extreme and time-consuming methods were obviously not within the prohibitions contemplated by the Indiana statute aimed at the evils of professional gambling.
The appellants' usage theory is further hampered by its portent of danger to the public. If we were to nurture the usage theory and correspondingly dilute the statutory recordation requirement so as to allow indicators to be considered recorders, we would in effect be allowing law enforcement officers to arbitrarily and subjectively determine what devices are and what devices are not gambling devices. Violation of the statute would depend only upon a showing that a particular device could be used to compute a payoff, whether or not there had ever been evidence of gambling or of intent to gamble on the type machine seized. Theoretically almost any type of equipment which had a dial or indicator could be the proper subject of seizure. The limit of the local unit's power to confiscate would only depend upon the imagination and inventiveness of the individual officer as to his ability to conceive ways in which men could gamble and payoffs be computed.
The mere fact that a particular instrumentality, machine or device may be used in violation of the law or for illicit purposes does not render the instrumentality, machine or device unlawful. Our system of jurisprudence does not punish the possibility of wrongdoing. Its sanctions are directed against overt acts coupled with evil intent. Markiton v. State (1957), 236 Ind. 232, 139 N.E.2d 440. Thus possession of an in-itself harmless hypodermic syringe or needle is not a violation of law unless such possession is coupled with an intent to violate the Uniform Narcotics Act. See Ind. Stat. Ann. § 10-3520 (Burns' 1970 Supp.), now known as I.C. 1971, XX-XX-X-X, and Moore v. State (1967), 248 Ind. 109, 223 N.E.2d 899. Similarly, possession of tools suitable for or capable of being used to commit burglary is not violative of the law unless accompanied by criminal intent. See Ind. Stat. Ann. § 10-703 (Burns' 1956 Repl.), being I.C. 1971, XX-XX-X-X. It is further established that the requisite intent cannot be presumed or inferred from the mere possession or existence of the device or instrumentality. Steinbarger v. State (1948), 226 Ind. 598, 82 N.E.2d 519. Were it otherwise, we might hold raindrops and windowpanes unlawful merely because there are those among us who are wont to wager upon the rapidity with which the former courses down the latter.
The clear intent of the Indiana legislature is to combat professional gambling operations. It would have been simple, had it chosen to do so, for the General Assembly to proscribe all free replay pinball machines as gambling devices as did the State of New York in its 1909 Penal Law § 982. (Compare the present statute enacted in 1965 as found in 39 McKinney's Consolidated Laws of New York, § 225.00 (7).)
In keeping, however, with the stated purpose of the Indiana Act, it is not found necesssary to extend the definition of "gambling device" to pinball machines which have no obvious professional gambling adaptations and which award only free replays which are immediately and mechanically conferred but are unrecorded in the proper sense of the latter word. Peachey et al. v. Boswell, Mayor et al. (1960), 240 Ind. 604, 167 N.E.2d 48; Tinder, Pros. Atty. et al. v. Music Operating, Inc. (1957), 237 Ind. 33, 142 N.E.2d 610. We are thus unwilling to extend that definition to include the indicating meters censured by the Attorney General in his 1968 Opinion.
*894 In denying validity to appellants' theory, we are not, however, willing to accede to appellee's definition of a "gambling device" within the meaning of the statute. In the trial court below, plaintiff-appellee's Exhibits 1 and 2 were branded as amusement type pinball machines which were typical of those leased by the plaintiff to location owner-operators. Plaintiff-appellee's Exhibits 3 and 4 were so-called "bingo" type pinball machines, clearly illegal in nature. Defendants' Exhibit A was an amusement type pinball machine specially equipped with a replay button having "knock-off" potential. By pointing out the various gambling adaptations of the "bingo" machines and the lack of them in plaintiff's Exhibits 1 and 2, the plaintiff portrayed the distinction between a gambling device and an amusement device as one of extremes  if the machine was not a "bingo" type machine it was not a gambling device under the statute. In light of the "gambling devices" identified and proscribed at the time of passage and amendment in 1957 of our anti-gambling act, this binary distinction may have been more valid at those times than today.
A profitable but illegal business must acclimate to legislative restraints if it is to survive. This of course means that substitutions must be made for devices or practices found to be illegal without sacrificing the operation's margin of profit. The inclusionary scope of "gambling devices" is thus necessarily dynamic, rather than static as plaintiff-appellee maintains. Stare decisis in this respect can therefore play only a limited role.[4]
Not unmindful of the immediately aforementioned caveat, we affirm the judgment of the trial court.
BUCHANAN and LOWDERMILK, JJ., concur.
ROBERTSON, J., dissents with opinion.
ROBERTSON, Judge (dissenting).
I cannot concur with the holding of the majority opinion for the reason that the interpretation of the word "unrecorded" does not carry out the intent of Burns' Ind. Stat. § 10-2330, I.C. 1971, XX-XX-X-X, or the holdings of Peachey v. Boswell (1960), 240 Ind. 604, 167 N.E.2d 48.
"The clear intent of the legislature was to prohibit the use and `maintaining' of pinball machines which are equipped with recording devices that may be used to compute `payoffs.'" 167 N.E.2d 48, 53. (Emphasis added.)
If a pinball machine has such a device it then constitutes professional gambling as defined in the statute, and is, therefore, illegal. The only possible exception would be in the instance of registering prepaid games.
The majority lays stress upon the factor of some degree of permanence to the recording. If the figures last long enough to be used to compute a payoff, the purpose has been served and it makes no difference how permanent thereafter it may be.
The trial court should be reversed.
NOTES
[1] One might recall the delightfully instructive dialogue between Alice and Humpty Dumpty in Lewis Carroll's "Through the Looking Glass" (Chapter VI):

"I don't know what you mean by `glory', Alice said. Humpty Dumpty smiled contemptuously. "Of course you don't  till I tell you. I meant `there's a nice knock-down argument for you!'"
"But `glory' doesn't mean `a nice knock-down argument,'" Alice objected.
"When I use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean  neither more nor less."
[2] A knock-off button is a switch connected to a specialized electric circuitry by means of which free games awarded may be erased from the free game indicator on the face of the machine, the games so erased normally being recorded automatically on a second, concealed counter.
[3] In most amusement machines the right to play several games may be purchased at one time at a rate more favorable than for a single game, e.g., three plays for a quarter as opposed to single games at ten cents each. The additional games not currently in play would be indicated upon the visible free game indicator.
[4] As stated in the comments to the definitions section of the Model Act:

"This definition [of a gambling device] is a composite of several statutory attempts to describe gambling devices in such a way that the ingenuity of the trade cannot defeat the legislative intent."
Handbook of the National Conference of Commissioners on Uniform State Laws (1952), p. 218.